UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-253 (3)  (MJD/BRT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S |
| | ) | SENTENCING POSITION |
| v. | ) | |
| | ) | |
| TIMOTHY ALAN DULANEY, | ) | |
| | ) | |
| Defendant. | ) | |

When Tim Dulaney was 15 years old, he thought he was man. He headed

out to the streets of Detroit and then Minneapolis. His biological father had been

in and out of prison as far back as Tim could remember and a part of Tim knew

the same was going to happen to him. It did happen. Thirty-six year old Timothy

Alan Dulaney has been in the criminal justice system since he was seventeen

years old.  More recently, while on supervised release after serving 120 months

for conspiracy to distribute and possession of a firearm, Mr. Dulaney re-offended

and is now facing a lengthy sentence. Mr. Dulaney has taken full responsibility

for his decisions and the consequences that will follow.

The PSR concludes his total offense level is 33, imposing an advisory

guideline range of 188 to 235 months. There are no guideline objections to the

PSR. However, there is a factual objection discussed below. At the time of

sentencing, Mr. Dulaney will be requesting the Court grant him a downward variance based on the many factors discussed below.

## OBJECTIONS TO THE PSR

Paragraph 12 of the PSR indicates that a stolen firearm was located in co-defendant Kline's vehicle. Paragraph 40 makes Mr. Dulaney responsible for the stolen firearm.  In the Plea Agreement, Mr. Dulaney took responsibility for the two firearms he kept hidden outside his home (not anywhere near Kline's parked car at the stash house).

> b.   <u>Specific Offense Characteristics</u>.  Other than as stated below, the parties agree that no other specific offense characteristics apply:
>
> (i)   <u>Possession of a Dangerous Weapon</u>: The parties agree that the offense level should be **increased by 2 levels**, because a dangerous weapon was possessed, namely a Heckler & Koch USP .45 caliber semi-automatic pistol, serial # 29024106; and a Ruger SR40C .40 caliber semi-automatic handgun, serial # 34340786.  U.S.S.G. § 2D1.1(b)(1).

Mr. Dulaney was aware that at times the informant (CRI-1 in paragraph 21 of the PSR and now a federally indicted defendant) made guns available. The person sold guns that he received.  He did not know that co-defendant Kline had a stolen firearm and it is not reasonably foreseeable that Kline would have had a gun in his car. Mr. Dulaney does not dispute a gun was found, but he should

only be held responsible for the two firearms he has admitted to possessing and no more.

## SENTENCING ANAYLSIS

### A.    Tim Dulaney's Background

#### 1.  Childhood

Mr. Dulaney was born in 1982 in Detroit, Michigan where he lived with his mother (and later a stepfather) and four siblings (one brother and three stepsiblings). He did not have a relationship with his biological father because his dad was in and out of prison most of Mr. Dulaney's life. When asked about his father, Mr. Dulaney barely remembers him because he was so absent from his childhood.  He passed away in 2004 when Mr. Dulaney was nineteen years old.

Mr. Dulaney left home when he was fifteen years old and hasn't returned for an extended period since.  Mr. Dulaney was a rebellious juvenile  because he did not feel comfortable in his home. Rather he sought comfort in the streets of Detroit.

#### 2.  Turning to the Streets

Mr. Dulaney dropped out of high school in 10th grade when he was fourteen years old.  He had frequently been in trouble at school and was suspended multiple times for fighting and truancy. Mr. Dulaney attempted to go back the following year at a specialized school, the Gerald R. Ford Jobs Corps

Center in Grand Rapids, Michigan.  The new school was short-lived because Mr. Dulaney was kicked out of the Job Corps program after only one month due to his marijuana use.  His parents were understandably angry at him for ruining his second chance at an education to better his life.  Looking back, Mr. Dulaney wonders how different his life would be today if he stayed in school.

Like most teenagers at fifteen years old, Mr. Dulaney was immature and did not want to listen to his parents. It was easier to listen to the older kids in the streets who showered Mr. Dulaney with "love." But there was always a price for that so called love.  Mr. Dulaney began to get caught up on life on the streets and not his home life.  A neighborhood friend who had recently moved to Minneapolis encouraged Mr. Dulaney to join him and bragged that there was easy money to be made selling marijuana in Minnesota.  The idea of making quick money and not living with his parents appealed to Mr. Dulaney, so he agreed to move.  The friend in Minneapolis had one of the older males he was staying with drove all the way to Detroit to pick up Mr. Dulaney in the middle of the night.  Mr. Dulaney took off for Minnesota and did not look back until his life began to spiral downward from his criminal behavior.

Mr. Dulaney did not know what he was signing up for when he moved to Minneapolis. He was quickly introduced to a life of selling drugs and crime. If Mr. Dulaney had been older and more mature he would have known that

4

something was wrong when a man he barely knew was so willing to drive in the middle of the night to get him.  Mr. Dulaney was used by the older male and his group of friends to sell their drugs, which resulted in his first arrest at seventeen years old.

Mr. Dulaney was uneducated and had never worked a "real" job.  He had no skills except for what he learned from dealing drugs and saw no way out once he arrived in Minnesota and knew no one but the people he sold drugs with. Mr. Dulaney lived on the streets and in crack houses for the next two years doing everything he could to survive as a juvenile with a 10th grade education. He was arrested when he was seventeen for dealing drugs.  After being released from jail, but prior to the resolution of the case, he called his parents and fled back home to Michigan.  Mr. Dulaney was arrested six months later on a warrant and was convicted of a drug trafficking crime.

Living on the streets, it became a way of life to carry a gun for protection.  Mr. Dulaney has seen or been a victim of violence many times in his life.  When Mr. Dulaney was seventeen years old, he was inside of a sporting goods store when he witnessed the owner get shot and killed.  Mr. Dulaney was also a victim of a home invasion in approximately 2003, when he was threatened with a handgun and his friend was shot and wounded with a shotgun.  More recently, in 2015, Mr. Dulaney was confronted by a man with a knife who was trying to

steal his girlfriend's purse.  Mr. Dulaney was told at a young age that he needed to have a weapon for his own protection, because the life he was living was a dangerous one.  That decision led to more criminal behavior.

### 3.  Criminal History

Mr. Dulaney began getting into serious trouble as a teenager long before he was mature enough to truly understand the consequences of his actions as he does now.  As stated earlier, at seventeen years old, he was convicted of a Second-Degree Controlled Substance Crime.  Mr. Dulaney was staying at a house with other individuals when the police came in a search warrant. Mr. Dulaney began flushing drugs down the toilet and was caught by an officer.

While on probation for that offense, Mr. Dulaney struggled with his drug addiction and had several violations.  In January of 2004, Mr. Dulaney was convicted of False Information to Police after he was stopped by an officer and gave them an incorrect name. He served 30 days in jail for that offense.  In March of 2004, Mr. Dulaney was arrested while officers were investigating an unrelated crime at the hotel he was staying at.  At the time, Mr. Dulaney had two warrants for traffic tickets and was observed kicking a gun under a bed.  Mr. Dulaney was convicted of Prohibited Person in Possession of a Firearm. He was sentenced to a 60-month stay of execution, and to serve 180 days with five years of probation.

Between 2001 and 2005, Mr. Dulaney also had four convictions for driving without a valid license.

While on probation for Possession of a Firearm in September of 2005, Mr. Dulaney was convicted of Conspiracy to Distribute 25 grams of Cocaine Base and Possession of Firearm. Mr. Dulaney served ten years for this crime.  He was released on supervision on November 20, 2014 and he was compliant and following all recommendations of probation until he was arrested for the instant offense in May of 2017, nearly three years after release.

From the age of seventeen to thirty- three Mr. Dulaney spent the majority of his life locked away in prison.  It is important to remember that Mr. Dulaney was exposed to violence in the criminal justice system. At least 75% of youth in the juvenile system have reported traumatic victimization and 50% reported symptoms of post-traumatic stress disorder.  Stress and trauma can in turn change the process of maturation for juveniles exposed to the criminal justice system. *See https://www.ncmhjj.com/wp-content/uploads/2016/09/Trauma-Among-Youth-in-the-Juvenile-Justice-System-for-WEBSITE.pdf*, last viewed October 4, 2018.

At fifteen Mr. Dulaney left home, and at seventeen years old Mr. Dulaney was incarcerated, an experience that could not have been a positive one, and at its worse could have been traumatizing.  It is also clear that the legal definition of a juvenile does not correspond with maturity level.  Although a person is

considered to be a juvenile if they are under eighteen, the maturation process takes much longer, and many essential decision-making areas of the brain are not fully developed until the mid to late twenties.  Mr. Dulaney is now in his thirties after much of his younger life was spent as an inmate in the legal system.  He is still learning and is now mature enough to understand the consequences of his decisions and knows in the future he will not turn to the criminal lifestyle when he has financial difficulties.  Mr. Dulaney is still young and wants to spend the rest of his life making up to his family and society for his poor decision-making and now has the maturity to do so.

### 4.  Adult life, life after prison

Mr. Dulaney has two children. A son, Timothy Jr., born in 2004, and a daughter, Talaysha Linnie, born in 2001.  Both children live with their mothers. Mr. Dulaney has a close relationship with his son and is working to build more of a relationship with his daughter. Ms. Bergman, his son's mother, expressed that although she is not in a romantic relationship with Mr. Dulaney, he has always been there for his son and took him almost every weekend for visits before he was arrested.  Mr. Dulaney also taught his son how to swim and play basketball.  Ms. Bergman has never seen or heard of any indication of illegal activities when Mr. Dulaney is around his son.  Mr. Dulaney was paying child

support and had no outstanding balance owed before he was taken into custody. Prior to his arrest, he had custody of his daughter.

When Mr. Dulaney left prison, he had no work experience and no job skills. Since being released, he has been in a serious relationship with Shakita Porter and was doing his best to make a legitimate life for himself and his family. In fact, he did do well by getting legitimate employment and going to school.  As discussed below his good life changed when he was laid off at work. That being said, he was in a good relation with Ms. Porter. Mr. Dulaney was living with Ms. Porter and her children for the past two years before this violation.  They are engaged and were planning to be married in June of 2018 at the Semple Mansion in Minneapolis but because Mr. Dulaney was in jail the wedding had to be canceled.

Ms. Porter has been extremely supportive of Mr. Dulaney and continues to support him as he waits to be sentenced.  Ms. Porter is employed full-time in the healthcare field and has no history of addiction or drug use and has been a positive influence on Mr. Dulaney. Ms. Porter reported that Mr. Dulaney has been an overall good partner and active father who had made a great deal of progress since being released from prison for his last offense.  She reports that although he was doing well, his addiction to alcohol and drugs has led him down the wrong path again.

### 5. Mental Health

Mr. Dulaney was diagnosed with depression and social paranoia in 2004. (PSR ¶¶ 93, 94.)  That year he was falsely accused of kidnapping and rape and was later acquitted due to DNA evidence. As a result Mr. Dulaney has a fear of public situations and has visited the hospital several times for anxiety and suicidal thoughts.  He still struggles with his mental health. Sometimes it is hard for him to reach out for help when he's confused or not sure what to do. But in order to avoid another bad decision that will surely end up with a prison sentence, he is open to getting help from mental health services.

### 6. Drug Use

Mr. Dulaney began using marijuana daily at the age of eleven and continued this until he was twenty-three years old. At fourteen years old, Mr. Dulaney began using alcohol occasionally and by 2004 he was drinking five days a week, with up to nine drinks per sitting.  At the age of seventeen, Mr. Dulaney began using cocaine about every other month.  Mr. Dulaney has attended outpatient treatment four different times and inpatient treatment once.   Each time Mr. Dulaney has relapsed within a few days of being released from inpatient treatment.  In 2010 and 2013, Mr. Dulaney completed a chemical dependency program with the Bureau of Prisons.   Mr. Dulaney has not used marijuana or cocaine from 2014 to present. His drug tests while on supervision

showed no use. However, he does admit he began to use alcohol excessively after he lost his job.

Mr. Dulaney is aware his alcohol use effects his life and he makes poor decisions when he is drinking. He turned to alcohol to cope with his inability to control what is going on in his life. After prison, Mr. Dulaney hoped to immediately take up a full-time job and be able to support himself and the people he cares about but it did not turn out as planned. Mr. Dulaney is learning now that he needs to ask for help from his support system and that life is not always going to go as planned but that he can get through it without resorting to a criminal lifestyle.

**B.     The Nature and Circumstances of the Offense**

**1.  The Offense**

The target of this investigation was never Mr. Dulaney. Rather, it was a currently charged federal defendant. That defendant agreed to cooperate soon after his arrest and then pointed law enforcement to Mr. Dulaney. Mr. Dulaney admitted that he rented a home on Colfax Avenue that began to be used as a stash house. A search warrant was executed at the address and twelve ounces of heroin and some drug paraphernalia were found inside. In a vehicle parked on the property (not registered to Mr. Dulaney but rather belonging to a codefendant) additional drugs and a handgun were found. A second warrant at

Mr. Dulaney's home address was conducted on June 6, 2017.  Outside the home, in a window well, two handguns, cocaine, heroin, and marijuana were located. Mr. Dulaney admits to his involvement in the offense and knew what he was doing was wrong.  He wanted to keep his family and children away from his illegal activities and believed not dealing drugs directly from the home he lived in would keep them away from any danger that comes along with selling drugs.

### 2.  Why did the offense occur?

Prior to this offense, Mr. Dulaney was afraid to ask for help when he needed it.  He had always supported himself since he left home at fifteen years old.  When Mr. Dulaney was released under supervision on November 20, 2014, after serving nearly ten years in prison, he wanted a new beginning, away from his previous life of crime.  Every drug test Mr. Dulaney has taken since release has come back clean and he was on the right track for over two years after leaving prison.

Mr. Delaney received his GED while in prison and after release he took classes at Minneapolis Community Technical College to learn the HVAC trade. Mr. Dulaney began working full-time and was proud of his career and ability to take care of his family with the money he made from working a legitimate job.

As part of his release conditions, Mr. Dulaney was in a halfway house and successfully graduated from its program.  Mr. Dulaney made friends while he

was there.  He believed it would be helpful to have a support system of people who had similar struggles with addiction and would to keep him on the right track.

Mr. Dulaney had an excellent full-time job as a mover for Slumberland Furniture, but he injured his back on the job from repetitively lifting heavy pieces.  Mr. Dulaney tried to heal and return to work as quickly as possible.  Around the same time, his partner, Ms. Porter was laid off from her job so financially they began to struggle.  He needed money to pay his bills, so he went back to work as a mover too soon after his injury, and it only exacerbated his back problems. Mr. Dulaney was forced to resign his position because he was no longer physically able to do his job.  Mr. Dulaney began working as an Uber driver, but the money was not consistent, so he needed to find a better job.  He began working at a bakery, more than full-time most weeks, until it began to affect his studies at school.  Mr. Dulaney had been going to school at MCTC.  The job at the bakery often ran over his scheduled shift and he would miss class or be unable to study as much as he should to be prepared.

Unfortunately, one of the men that Mr. Dulaney stayed in contact with began selling drugs shortly after leaving their halfway house and came in contact with Mr. Dulaney when he was struggling at his job at the bakery.  The friend suggested Mr. Dulaney could make easy money if he started dealing drugs again

and wanted to pull him back into the lifestyle.  Mr. Dulaney resisted at first, but when he was unable to find a job and his bills were piling up, he gave in rather than asking for help from someone in his support system.

At first, Mr. Dulaney only sold marijuana to make ends meet.  Mr. Dulaney began drinking excessively around the same time as a coping mechanism for his back pain and the loss of control over his life.  He got into verbal fights with Ms. Porter and decided he needed to have his own place.  Mr. Dulaney rented a house, but shortly after got back together with Mr. Porter.  Ms. Porter was unaware of the rental home.  Mr. Dulaney used the house for meeting his friends at first, but overtime his friends convinced him that it would be a good place to conduct illegal activities from.  The whole situation quickly spiraled out of control for Mr. Dulaney and he felt he had no say over the activities taking place in the house.  Multiple people had keys and would come and go as they pleased.

Mr. Dulaney insisted on only selling marijuana at first, but after seeing his friends making a lot more money with much less effort, Mr. Dulaney started to sell harder drugs. These poor decisions have led us to this instant case.

### 3.  Mr. Dulaney's role was "minor" compared to others

Mr. Dulaney was deemed an average participant and Mr. Dulaney does not object to that characterization. Mr. Dulaney does request that the Court look

at his role.  We know codefendant Kline who was the source of the drugs

received a sentence of 10-years. Mr. Dulaney rented a house that drugs were later

found in but had no control over the what drugs and the amount that were being

stored at that location by others – such as those drugs found in Kline's car.

Although Mr. Dulaney rented the home, he had no say over what was stored

there and the amount of drugs kept in the house. Rather, he received drugs from

the sources, and in turn sold those drugs.  A majority of the money would go

back to the source.

## C.    Protection of the Public

Mr. Dulaney accepts full responsibility for his actions.  He made a series of

terrible decisions that lead him to the point he is at now.  Underlying this

offense, Mr. Dulaney's motivation for this crime was to financially take care of

his family.  Mr. Dulaney wrote a detailed letter that has been submitted to the

Court where he explains how he got to where he is today and what will make a

difference the next time he is released from prison.

What makes this crime different from his previous offenses is Mr. Dulaney

now has a fiancé and children and he has matured enough to appreciate having

them in his life.  When he went to prison last time, he was still immature and

wasn't thinking about what he wanted to do with the rest of his life as he does

now.  He wants to be present to see his children grow up and to be that father

figure in their life.  Mr. Dulaney has expressed that he knows he made a terrible

decision and knows now that it is ok to ask for help.  The last time he went to

prison he felt like he had nothing to lose and that it was just a part of the lifestyle

he had chosen.  He already has felt the consequences of his actions when he had

to cancel his wedding to Ms. Porter because he was locked away, he continues to

feel the continued consequences every day that he misses being with her and his

children.  Mr. Dulaney now wants out of that lifestyle and wants to be a father

and provider for his family using income from a legitimate job.

More than anything Mr. Dulaney needs to get treatment and counseling to

understand how to make better decisions in the future.  He needs mentoring

through healthy relationships, and he needs his family who is very supportive of

him.  He needs employment that will allow him to work 40 hours a week and the

ability to go back to school to finish his HVAC training. With these things in

place Mr. Dulaney poses no risk to the community.

## D.    Deterrence

In United States Department of Justice's report *Five Things About*

*Deterrence*, May 2016, the National Institute of Justice summarized a large body

of research related to deterrence and made two significant findings.[1] First, the

article explains that evidence shows "sending an individual convicted of a crime

---

[1]  *See* Five Things About Deterrence, U.S. Dept. Of Justice, Office of Justice Programs, National
Institute of Justice, May 2016, available at https://ncjrs.gov/pdffiles1/nij/247350.pdf

to prison isn't a very effective way to deter crime. ... [p]rison is an important

option for incapacitating and punishing those who commit crimes, but the data

show long prison sentences do little to deter people from committing future

crimes."

Second, and in concert with this evidence, the National Institute of Justice

submits that "increasing the severity of punishment does little to deter crime ...

[because of] [t]he lack of any 'chastening' effect from prison sentences, [t]hat

prisons may exacerbate recidivism, [t]he different impacts of the certainty versus

the severity of punishment on deterrence, and [t]hat individuals grow out of

criminal activity as they age." *Id*.

Thus, as the study explains, sending Mr. Dulaney to prison for a long

period is not an effective way to deter his criminal conduct or the conduct of

others.  And there can be no doubt, as an offender ages, the rate of recidivism

decreases.[2] Research has shown that individuals like Mr. Dulaney are much less

likely to recidivate upon their release from prison when they are older. Thus, Mr.

Dulaney's age is another important factor in support of a sentence of 120-

months.

---

[2]  *See* U.S. Sent'g Comm'n,  Measuring Recidivism: The Criminal History Computation Of The
Federal Sentencing Guidelines, at 12, 28 (2004) ("Recidivism rates decline relatively
consistently as age increases."), *available at*
http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal
_History.pdf

If there is any doubt about Mr. Dulaney 's recidivism upon release, he will still be under the jurisdiction of the federal courts for at least five years. This is good for a number of reasons:

1) Mr. Dulaney will be able to get the housing and community support he needs from United States Probation Department and hopefully with the Court's reentry program,

2) he will have the support of his fiancé and family,

3) a term of supervised release will ensure that Mr. Dulaney is drug-free and employed when he is actually living in society again,

4) the extra accountability will ensure that Mr. Dulaney establishes a stable and strong, law-abiding life that will keep him from returning to prison, and

5) this go around will be different because of Mr. Dulaney's behavior after his arrest in this matter.

In sentencing Mr. Dulaney, he asks the Court to consider that prison will be a very dangerous place for him because of his behavior after his arrest. He does not need a lengthy sentence for the purpose of deterrence, and five years of federal supervised release will ensure Mr. Dulaney's success.

## E.    Pretrial Custody

As stated earlier, Mr. Dulaney has been at the Anoka County Jail for two years. During that time, he has had no violations. More significantly, he has received no programming.

18

**F.**     **Supervised Release Violation**

Mr. Dulaney will admit he violated the conditions of his supervised

release.  It is important to note that while on supervision, he did well for the first

two years. He worked, attended school, kept in contact with his probation

officer, gained custody of his daughter, paid child support, and remained drug

free. The parties agree the time for the violation should run concurrent with this

instant case. Mr. Dulaney will admit that he violated his supervision in Crim.

No. 05-383 (DWF).  He will admit that he violated the conditions by failing to

remain law abiding.  The violation is a Grade B violation and carries 12 to 18

months.  Respectfully, Mr. Dulaney requests that the violation time run

concurrent with any penalty imposed in this case. Running a violation time

concurrent is not unusual. In *United States v. Derek Johnson*, Crim. No. 07-92 (PJS)

(a gun case), Mr. Johnson violated his supervised release by failing to remain law

abiding.  The violation had an advisory guideline range of 21 to 27 months.  This

Court imposed 21 months to run concurrent with his sentence in Crim. No. 14-

130 (a gun case).  In *United States v. Michael Brooks Bynum*, Crim. No. 12-172

(SRN), the Court ran Mr. Bynum's violation for his supervision term for

possession of a firearm concurrent with this new firearm and robbery

convictions. In *United States v. Trudale Williams,* Crim. No. 17-60 (SRN), the

violation term for possessing a firearm ran concurrent with the new firearm case.

Respectfully, Mr. Dulaney requests the violation time run concurrent with this instant case.

## THE FUTURE

After this case is resolved Mr. Dulaney would like to return home to his fiancé and continue to provide for his children after finding a job. Mr. Dulaney knows that his skills will likely not put him in the highest paying position, but he is prepared to work hard in whatever job he is offered and hopes to go back to school to open additional opportunities in the future.  He knows he made decisions that have landed him in the position he is in today. He will take steps and use all resources available to him to prevent falling into the same lifestyle again.  Mr. Dulaney is determined to make a change and he can do so. A lengthy sentence cannot enhance any of the consequences for Mr. Dulaney, he is already experiencing them to the fullest by being locked up and separated from his family and missing out on life's milestones everyday he is gone.

## CONCLUSION

Mr. Dulaney committed a crime; he possessed a firearm and sold drugs. How much time is warranted to achieve the goals of sentencing? He is thirty-six years old.  Respectfully, because of the information contained in this memorandum Mr. Dulaney is requesting a sentence of no more than 120-months followed by five years of supervision.

Dated: May 9, 2019                    Respectfully submitted,

                                      *s/Manny K. Atwal*

                                      _____

                                      MANNY K. ATWAL
                                      Attorney ID No. 0282029
                                      Attorney for Defendant
                                      107 U.S. Courthouse
                                      300 South Fourth Street
                                      Minneapolis, MN 55415